# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **KENDALL MCCLENNON,** | ) **No. 1:14-cv-03233** |
| | ) |
| **Plaintiff,** | ) |
| | ) **Judge Mannish S. Shah** |
| **vs.** | ) |
| | ) |
| **CITY OF CHICAGO, Chicago Police Officer** | ) |
| **RAYMOND PIWNICKI, #7858, MARGARET** | ) **Magistrate Judge Mary M. Rowland** |
| **MCDEVITT as Special Representative for** | ) |
| **Chicago Police Officer BRIAN MCDEVITT,** | ) |
| **#13197, Chicago Police Officer THOMAS** | ) |
| **CAREY, #18795,** | ) |
| | ) |
| **Defendants.** | ) **Jury Demand** |

## SECOND AMENDED COMPLAINT

1.      Plaintiff Kendall McClennon was physically brutalized, tased, and subjected to racist verbal abuse by Chicago Police Officer Raymond Piwnicki, who has amassed eighty-nine civilian complaints of misconduct in the span of fourteen years with the Chicago Police Department.  Approximately half of these complaints allege Defendant Piwnicki used excessive force, and many include allegations that he spewed racial epithets and slurs at his victims, almost all of whom are Black and/or Latinx.[1]

2.      Despite awareness of Defendant Piwnicki's repeated use of excessive force and racist verbal abuse, the City of Chicago failed to properly and meaningfully supervise and discipline Defendant Piwnicki, thereby allowing him to act with impunity resulting in Defendant Piwnicki's abuse and mistreatment of Plaintiff McClennon, who became the eighty-eighth victim of at least eighty-nine known victims.

---

[1] The term Latinx is a gender-neutral alternative to Latino/a.

1

3.    Plaintiff McClennon, like scores of others, complained of physical abuse and mistreatment by Defendant Piwnicki.  The City of Chicago, by and through its Chicago Police Department, not only failed to discipline Defendant Piwnicki in response to these complaints and other known misconduct, but instead, condoned and encouraged his misconduct, and later promoted him to detective shortly after he abused Plaintiff McClennon.

4.    Plaintiff McClennon seeks just compensation for the physical pain, mental anguish, distress, malicious prosecution and other damages he suffered as a result of this painful and traumatic incident, and to hold Defendant Piwnicki, the other Defendant Officers and the City of Chicago accountable for the violation of his rights under the U.S. Constitution and Illinois state law.

## Jurisdiction

5.    The jurisdiction of the court is invoked pursuant to the Civil Rights Act, 42 U.S.C. § 1983; the judicial code, 28 U.S.C. §§ 1331 and 1343(a); the Constitution of the United States; and supplemental jurisdiction as provided under 28 U.S.C. § 1367(a).

## Parties

6.    Plaintiff Kendall McClennon is an African American resident of the City of Chicago, Illinois.

7.    Defendant Chicago Police Officers Raymond Piwnicki,[2] Star #7858, Brian McDevitt, Star #13197,[3] and Thomas Carey, Star #18795 were, at the time of this occurrence,

---

[2] At the time of the events that gave rise to this lawsuit, Defendant Piwnicki was a police officer with Chicago Police Department.  During the course of these proceedings, Plaintiff's counsel learned that Defendant Piwnicki was promoted to the rank of detective in the Chicago Police Department.

[3] Chicago Police Officer Brian McDevitt passed away after the incident alleged herein.  Pursuant to 735 ILCS 5/2-1008, Margaret McDevitt, the widow of Chicago Police Officer McDevitt, is named as the Special Representative for Officer McDevitt and is being sued as a personal

duly appointed Chicago Police Officers.  Defendants engaged in the conduct complained of while on duty and in the course and scope of their employment with the City of Chicago.

8.      At all times material to this complaint, Defendant Police Officers Piwnicki, McDevitt and Carey were acting under color of state law, ordinance, and/or regulation.  Each is sued in his individual capacity.

9.      Defendant City of Chicago is a municipal corporation, duly incorporated under the laws of the State of Illinois, is the employer and principal of the Defendant Police Officers, and is responsible for the policies, practices and customs of its Police Department, City Council, Office of Professional Standards, Independent Police Review Authority and Police Board.

### Plaintiff McClennon's Encounter with Defendant Officers on May 5, 2012

10.      On the evening of May 5, 2012, Plaintiff Kendall McClennon was attending a family gathering at his cousin's house at 6519 South Fairfield Avenue in Chicago, Illinois with several of his family members and their young children.

11.      At around 7 p.m., Plaintiff McClennon stepped out of the backyard, into the alley and relieved himself.  Moments later he returned to the backyard.

12.      Without permission or consent from any of the residents or guests at 6519 South Fairfield, Defendant Officers forcibly entered the backyard of the residence from the alley.

13.      When entering the backyard of 6519 South Fairfield, Defendant Officers Piwnicki, McDevitt and Carey broke open the backyard gate separating the yard from the alley behind the residence, breaking the door lock and damaging the gate frame and door.

14.      Without justification, Defendant Officers drew their guns from their holsters and

---

representative responsible for defending him in this matter.  In naming Margaret McDevitt as the personal representative for Officer McDevitt, Plaintiff will not seek any punitive damages against Ms. McDevitt.

pointed their weapons at Plaintiff McClennon and other residents and guests at the gathering.

15.     When Plaintiff McClennon questioned why the Defendant Officers had their guns out, pointing out the presence of young children in the backyard, Defendant Piwnicki physically attacked Plaintiff McClennon, forcing his body down on to a wooden deck.

16.     Defendant Piwnicki cuffed Plaintiff McClennon's hands behind Plaintiff's back and struck Plaintiff about his body. Defendants McDevitt and Carey failed to intervene to stop said physical abuse despite having the opportunity to do so.

17.     The Defendant Officers also forced two other Black men in the backyard down on the back deck and handcuffed them without any justification or reason.

18.     The Defendant Officers then observed Plaintiff McClennon's sister, Cicely McClennon, with a camera in her hand.

19.     The Defendant Officers forcibly removed the camera from her hand and handcuffed her behind her back.

20.     Plaintiff McClennon requested the Defendant Officers leave his sister alone,

21.     Defendant Piwnicki then shot his TASER gun at Plaintiff McClennon, while Plaintiff was on the ground with his hands still handcuffed behind his back.

22.     Defendant Piwnicki then used his TASER gun to "drive stun" Plaintiff McClennon in the head, again while Plaintiff McClennon was on the ground with his hands handcuffed behind his back.

23.     Defendant Officers McDevitt and Carey were standing nearby when Defendant Piwnicki tased Plaintiff McClennon and they failed to protect Plaintiff McClennon from the shocks and pain therefrom despite having the duty and opportunity to intervene.

24.     Plaintiff McClennon did not physically attack, assault, threaten or physically

4

resist the Defendant Officers in any way.

25.     Throughout the incident, Defendant Piwnicki used racially derogatory language and insulted Plaintiff McClennon, his family and other guests at the gathering, at one point calling them "animals."

26.     Defendants Piwnicki, McDevitt and Carey agreed to conspire with one another to complete false and incomplete official reports, give a false and incomplete version of the events to their superiors, and file false charges against Plaintiff McClennon.  Specifically, Defendant Officers falsely claimed Plaintiff McClennon physically resisted Defendant Piwnicki's attempt to stop, frisk and handcuff him and that Plaintiff McClennon battered Defendant Piwnicki by grabbing Defendant Piwnicki's right arm and cutting him.   These charges were false and were initiated by the Defendant Officers in order to cover up their misconduct.

27.     While in police custody, Plaintiff McClennon was taken to Holy Cross Hospital, where he received treatment for the injuries he sustained as a result of the unnecessary and excessive force used by Defendant Piwnicki and the other officers.

### Defendant Officers Maliciously Prosecuted Plaintiff McClennon

28.     Defendant Officers subsequently charged Plaintiff McClennon with Aggravated Battery of a Police Officer, Resisting an Officer, Possession of Cannabis and Urinating on the Public Way, forcing Plaintiff McClennon to retain attorneys and appear in court to defend himself on several occasions over the course of several years.[4]

29.     Both Defendants Piwnicki and Carey attended court dates in the criminal proceedings, and both appeared at the courthouse at Plaintiff McClennon's criminal trial.

---

[4] Aggravated Battery of a Police Officer is a class 2 felony.  *See* 720 ILCS 5/12-3.05(d)(4) and (h).  If Plaintiff McClennon was wrongfully convicted of this crime, he could have been sentenced to serve three to seven years in prison.  *See* 730 ILCS 5/5-4.5-35.

30.     On November 16, 2016, Defendant Piwnicki testified at Plaintiff McClennon's criminal trial and provided false testimony about the events of May 5, 2012.

31.     At the conclusion of the trial on November 16, 2012, Plaintiff McClennon was acquitted and the criminal proceeding was terminated in his favor.

## Defendant Piwnicki's Prior Acts of Excessive Force, Racist Verbal Abuse and other Official Misconduct

32.     Plaintiff McClennon is not the first to allege that Defendant Piwnicki has engaged in excessive force, racist verbal abuse, false arrest and malicious prosecution.

33.     Defendant Piwnicki has repeatedly engaged in a pattern and practice of filing false charges and engaging in physical and racist abuse against people of color in the City of Chicago.

34.     To date, there have been eighty-nine complaints of misconduct filed against Defendant Piwnicki in a fourteen-year time span, from the time he started with the Chicago Police Department in June of 1998 through December 5, 2012.

35.     In 48.3% of the eighty-nine complaints, Defendant Piwnicki was accused of engaging in excessive force; he was also accused of using racist verbal abuse in 20.2% of the eighty-nine complaints, including but not limited to the following allegations:

        a.      On August 13, 2000, a Black pregnant woman alleged she was stopped at gunpoint by an unidentified partner of Defendant Piwnicki, who forced her to get on the ground.  She was handcuffed and placed in the back of a squad car where she got into a verbal argument with Defendant Piwnicki who slapped her in her face.  Defendant Piwnicki's partner also said "we don't like black pregnant women" and made other derogatory statements of a racist and sexist nature.  (CR 266694);

6

b. On August 24, 2000, a Black man alleged he was with his cousin when Defendant Piwnicki and his partner, Officer Gade, approached them in an unmarked police car in an alley and told them to come to the car. The victim ignored the officer's request. Defendant Piwnicki then approached the victim and sprayed him in the face with pepper spray. Officer Gade then hit him in the face with a flashlight. The victim fell and balled up on the ground, where Defendant Piwnicki and Officer Gade repeatedly kicked him. The victim was handcuffed, taken to the station and the officers refused victim's request for medical treatment. (CR 265117);

c. On October 26, 2000, a Black man alleged that he was walking to a restaurant when he was stopped by Chicago Police Officers, who drove their car onto the sidewalk. He was searched, and even though they did not find any contraband on him, they accused him of possessing narcotics. The victim was arrested, handcuffed and put in a squad car. While cuffed in the car, Defendant Piwnicki punched and slapped the victim in the face, and punched him in the stomach. (CR 267343);

d. On November 27, 2000, a Latino man alleged that he was walking down the street when Defendant Piwnicki and two other Chicago Police Officers approached him, stopped him, and searched him for drugs. Defendant Piwnicki slapped the victim in the face, one of Defendant Piwnicki's partners elbowed him and also slapped him in the face, and the third partner threatened the victim and called him a "Fucking Puerto Rican." An unrelated civilian witnessed this incident and reported it to the Office of Professional Standards. (CR 267496);

e. On July 9, 2001, a Black man alleged that he was riding his bike across a field when Defendant Piwnicki and Officer Smith drove their police car into him and

pinned him against a fence. Defendant Piwnicki exited the vehicle and pushed the victim's head into the ground and struck him twice on the back of his head. The victim received medical treatment for his injuries. Defendant Piwnicki and his partner falsely charged the victim with possession of a controlled substance and the criminal case was dismissed. The victim subsequently sued Defendant Piwnicki and the City of Chicago and the case was settled. (CR 272894);

f.     On March 8, 2002, a Black man (the victim) alleged that he was walking with his cousin, sister and girlfriend, when they were approached by a police car. Defendant Piwnicki and Officer Smith exited the car with their guns drawn.   Officer Smith pushed the victim against a wall, handcuffed him and put him in a squad car, where Defendant Piwnicki punched the victim in the face. The officers accused the victim of being involved in a car accident that caused damage to a police vehicle. When the victim denied the allegations, one of the officers said "this one is going on you." When the victim asked why he was being falsely charged an officer said to him "Shut up you black bitch. You are a waste of sperm, nigger." (CR 279202);

g.     On March 23, 2002, a thirteen-year-old Black girl alleged that she was playing with her sibling and cousins when she threw a stick in the street as Defendant Piwnicki and Officer Smith were driving by. The Officers exited their car. Defendant Piwnicki approached the young victim, pushed her face with his hand, grabbed her arm pulled it behind her back, threatened to "smack the shit out of her" and called her and the other children "cocksuckers." (CR 279250);

h.     On June 2, 2002, a Latino man alleged that he was driving with his wife, father and brother when he was stopped by Defendant Piwnicki and Officer Smith.   After

8

he was stopped, Defendant Piwnicki told the victim to "put his fucking hands up," grabbed him, yanked him out of his car and handcuffed him. When the victim asked what was going on, Defendant Piwnicki told him "to shut the fuck up" and smacked him on the backside of his head. When the victim attempted to read Defendant Piwnicki's badge, Piwnicki told him not to look at him. Defendant Piwnicki also told the victim's wife to "shut the fuck up" and ordered her away from the car. The complainant was not arrested but reported the incident to the Office of Professional Standards (OPS), identifying the license plate to the car driven by Defendant Piwnicki. (CR 281125);

      i.     On August 13, 2002, a Black woman alleged that while she was standing inside the gate of her apartment building she was questioned by Defendant Piwnicki as to where she lived. When she responded "I live here where I am standing," Defendant Piwnicki stated "you better tell me, bitch," and threatened to throw her to the ground and arrest her for trespassing. When the victim countered that he could not do that because she was not trespassing, Defendant Piwnicki grabbed her by the arm, called her a "cunt," threatened to put marijuana on her, handcuffed her and said "you had to get fucking smart on me now you are going to jail." Defendant Piwnicki cuffed the complainant tightly, and when she asked why he put the handcuffs on so tight, Defendant Piwnicki said "Shut up you cunt nigger bitch," and backhanded her across the right side of her face. After Defendant Piwnicki put her in his squad car, she questioned "why did you put your hands on me?;" in response, Defendant Piwnicki stopped the car, grabbed the victim's hair and struck her repeatedly in the face. Later, at the police station, Defendant Piwnicki grabbed the victim by the neck, threw her down on a bench, and said "shut up you fucking cunt" after the victim asked to speak with a sergeant. The complainant also alleged that Officer

9

Smith, Defendant Piwnicki's partner, witnessed the misconduct and failed to report it.
Defendant Piwnicki falsely charged the victim with drinking on the public way.
Unrelated civilian witnesses corroborated the victim's allegations of physical and verbal
abuse and the victim received medical treatment for her injuries.  (CR 283229);[5]

   j.  On May 10, 2003, three Latino men and two Latina women were driving
in a car and attempting to park when the drivers in two different vehicles behind them
began honking their horns.  After parking his car, one of the male victims was
approached and confronted by Defendant Piwnicki, who was in plainclothes and said
"What the fuck, why are you rolling your eyes?" When this victim responded he didn't
know Defendant Piwnicki, Defendant Piwnicki said "Shut the fuck up, wetback." The
victim told Defendant Piwnicki to leave them alone, when a white female officer, Officer
Chapin, who was also in plainclothes, approached and said "You don't know who you are
fucking with," while drawing her firearm.  When the victim started to write down the
license plates of the cars driven by Defendant Piwnicki and Officer Chapin, the female
officer told Defendant Piwnicki they should go.  As Defendant Piwnicki was leaving the
scene, he punched the victim in the face, breaking his glasses.  A second Latino male
victim in the car corroborated the allegations of the first Latino male victim. The second
victim also reported that as Defendant Piwnicki was leaving he also punched the second
victim in the jaw and said "You ain't going to do nothing! Fuck you, you spics, you

---

[5] The Office of Professional Standards (OPS) originally sustained allegations against Defendant
Piwnicki for striking the victim in the face and directing numerous profanities at her including
"bitch," "nigger," and "cunt." The OPS also sustained an allegation against Officer Smith for
disobedience of a direct order for, *inter alia*, failing to stop the abuse of the victim and failing to
take any action to report it to a supervisor.  During the command channel review, Defendant
Piwnicki's supervisors objected to the findings, and, upon information and belief, the findings
were overturned.

wetbacks." The two female passengers corroborated the versions given by male victims and further noted that both Defendant Piwnicki and Officer Chapin made derogatory remarks saying "fucking Mexicans" and "stupid Mexicans." (CR 289333);

k.       On October 5, 2003, two Black men were approached by Defendant Piwnicki and Officer Rigan after one of the Black men, victim A, was in an altercation with a third party. According to victim A, when Defendant Piwnicki and Officer Rigan approached, they asked the third party if they were having a problem with these "Niggers and animals." Defendants Piwnicki and his partner then punched victim A in the neck, knocked him to the ground and picked him up and then kneed him in the groin several times. Victim B alleges that he was punched about his body, knocked to the ground, and while on the ground he was handcuffed and kicked about his body. Victim A witnessed Defendant Piwnicki and Officer Rigan punch and kick victim B. Victim B observed Defendant Piwnicki and Officer Rigan punch victim A in the neck and knee him in the side. Both victims received medical treatment for their physical injuries. (CR 292855);

l.       On September 29, 2005, a Black wife and husband were at the courthouse at 1340 S. Michigan to attend a court date for a relative. The wife alleges that while she was attempting to step into the elevator, Defendant Piwnicki (who wore a shirt to cover his uniform) slammed his hand across her chest and moved her away to create space for his partner to step onto the elevator. When the woman's husband verbally confronted Defendant Piwnicki, Piwnicki responded "Shut the fuck up you coon . . . You fucking cluck."[6] Defendant Piwnicki then pushed the woman and started swinging at her husband. Defendant Piwnicki and the husband attempted to strike each other. During the

---

[6] "Cluck" is a colloquial term for someone who uses cocaine.

encounter, Defendant Piwnicki grabbed the husband by the neck, called him a "coon" "cluck" and "nigger, coon." Cook County Deputy Sheriffs separated the husband from Defendant Piwnicki and held him against the wall.  Even after the husband was physically detained against the wall by Deputy Sheriffs, Defendant Piwnicki attempted to further attack him saying: "I'll see you in court you fuckin coon, and I'm going to see to it that you will pay." In addition to the wife and husband spontaneously reporting these events to the Deputy Sheriffs, several Deputy Sheriffs corroborated the portions of the incident they witnessed. Defendant Piwnicki followed through with his threat and falsely charged the husband with making threats to the officer.  The criminal charges were ultimately dismissed.  The allegations made by the couple were sustained by the OPS and it was recommended that Defendant Piwnicki be suspended for twenty days. (CR 308792);

m.      On October 12, 2005, a former, Black male Chicago Police Officer approached Defendant Piwnicki as he was arresting two Black men and asked Defendant Piwnicki for an ID; Defendant Piwnicki refused to provide identification.  The two officers engaged in a verbal and physical altercation, and at one point the Black officer said to Defendant Piwnicki "I know how you motherfuckers roll, you're not on the plantation anymore."  The Internal Affairs Division (IAD) found that both officers engaged in an unjustified verbal or physical altercation and recommended each officer be suspended for three days. (CR 309085);

n.      On July 10, 2006, a young Black man alleged that he was sitting in his yard when Defendant Piwnicki approached him, told him "to come here you fucking Negro," slapped him in the face repeatedly, and planted an empty bottle of alcohol that

was laying on the street in the young victim's back pocket. When the victim removed the bottle from his pocket and threw it on the ground, Defendant Piwnicki kicked him in his groin area, repeatedly called him a "negro" and made other derogatory remarks to him including that his "mother must have been a crackhead." Defendant Piwnicki falsely arrested the victim for drinking on the public way. The victim's mother observed the incident and heard Defendant Piwnicki call her son a "nigger." The OPS investigator sustained the allegation that Defendant Piwnicki verbally abused the man, finding there was "sufficient evidence to support the allegation that PO Piwnicki used profane and derogatory language toward the victim." The OPS investigator further found "PO Piwnicki has clearly exhibited a pattern of using profane and derogatory language in his contact with citizens." OPS recommended that Defendant Piwnicki be reprimanded for this incident. (CR 306868);

      o.     On February 20, 2011, a Black man alleged that he was standing on the street giving his mother a hug when Defendant Piwnicki and Officer Sullivan drove up in an unmarked squad car. Defendant Piwnicki ordered the victim over to the car, stating "get over here, you fat greasy nigger." When the victim responded "wow" and failed to head towards their car, Defendant Piwnicki and Officer Sullivan exited their car, chased the victim, and knocked a bottle of juice out of his hands. The victim was criminally charged. (CR1043517);

      p.     On February 23, 2011, a Black female CDT Transportation driver picked up a passenger and attempted to secure the passenger's belongings in the back storage area of the van pursuant to CDT Transportation policy. After the passenger refused to allow her possessions to be secured in the back of the van or exit the van, the CDT Driver

contacted the police and Defendant Piwnicki responded. Defendant Piwnicki ordered the CDT to violate CDT rules and strap the passengers' belongings in the middle of the van. The CDT driver refused to do so. Defendant Piwnicki yelled at the CDT driver, saying "Fuck your policies. I don't give a fuck about your policies." Defendant Piwnicki handcuffed the CDT driver and threatened to tase and arrest her. The CDT driver sustained injuries to her wrist and received medical treatment for this injury. (CR 1043526);

q. On May 18, 2011, a Puerto Rican woman was driving through an alley east of Cicero Avenue on the way to a medical appointment at a hospital when she was stopped by Defendant Piwnicki, who was responding to a traffic altercation involving other parties. When the victim acknowledged that she was cutting through the alley, Defendant Piwnicki told her that she was breaking the law and stated "You people should go back to Mexico. Because of people like you, this City is messed up." The victim drove away and exited the alley, parked her car and returned to the area to request Defendant Piwnicki's name and badge number. When asked for his name and badge number, Defendant Piwnicki handcuffed the victim tightly causing her pain and injury, put her in the back of his squad car, repeatedly yelled at her and said "you people only understand beatings." When the victim informed him the handcuffs were too tight, Defendant Piwnicki responded "I don't care what the fuck they are." Defendant Piwnicki also threatened that the victim that she would lose her job at the Chicago Public Schools, where she works as a special education teacher, because he was going to contact them and inform them of her arrest. The victim was eventually released from Defendant Piwnicki's custody and received medical treatment for the slight fracture she sustained to

her wrist from the handcuffs Defendant Piwnicki placed on her too tightly.  (CR 1045507).

**The City of Chicago and the Chicago Police Department's Failure to Investigate, Supervise, Monitor and Discipline Defendant Piwnicki**

36.    The vast majority of the eighty-nine complaints filed against Defendant Piwnicki were insufficiently or improperly investigated by the Office of Professional Standards (OPS), the Independent Police Review Authority (IPRA) and/or the Internal Affairs Division (IAD), resulting in "not sustained" or "unfounded" allegations.

37.    Of the eighty-nine complaints lodged against Defendant Piwnicki, only five resulted in sustained findings against Defendant Piwnicki for, *inter alia*:

a.    "insubordination" in 2000 (CR 263697);

b.    failing to report a fellow member of the CPD who was under investigation by another law enforcement agency in 2004 (CR 297735);

c.    verbally abusing a Black male arrestee calling him "a fucking Negro" in July of 2005 (CR 306868);

d.    engaging in excessive force and using profanity against a Black couple in September of 2005, wherein the couple alleged Defendant Piwnicki struck the woman in the chest, grabbed the man by the neck, swore at them, and called them names, including "nigger" "coon" and "cluck"  (CR 308792); and

e.    engaging in an unjustified physical or verbal altercation with a Black male Chicago Police Officer in 2005 (CR 309085).

38.    In the limited number of five cases in which the allegations of misconduct lodged against Defendant Piwnicki were sustained, OPS, IPRA or IAD recommended he be suspended for less than thirty days or merely reprimanded.

39.     Such insufficient punishment did not deter Defendant Piwnicki's routine and serial use of excessive force, racist verbal abuse, bringing false charges, other violations of the law and egregious, unprofessional misconduct.

40.     Because he was insufficiently disciplined for engaging in excessive force and using racist language, he physically abused, injured and racially taunted Plaintiff McClennon making him the 88th victim of the 89 known victims identified in the complaints filed against Defendant Piwnicki with the City of Chicago.

### Plaintiff McClennon's Damages

41.     As a result of these events, Plaintiff lives with the traumatic memory of this incident.

42.     As a direct and proximate result of the Defendant Officers' actions, Plaintiff McClennon suffered and/or continues to suffer, *inter alia*, bodily injury, pain, suffering, loss of liberty, lost wages, severe mental distress, fear, anguish and/or humiliation, medical and legal expenses.

### COUNT I
### [42 U.S.C. § 1983 Claim for Excessive Force/Failure to Intervene]

43.     Plaintiff re-alleges paragraphs 1 through 42.

44.     The acts of Defendant Officers Piwnicki, Carey and McDevitt in repeatedly striking and deploying a Taser against Plaintiff, and/or in failing to prevent said abuse, violated Plaintiff's rights under the Fourth Amendment to the United States Constitution to be secure in his person, papers and effects against unreasonable searches and seizures, and his right to due process under the Fourteenth Amendment to the United States Constitution, and thus violated 42 U.S.C. § 1983.

45.     The actions of Defendant Officers Piwnicki, Carey and McDevitt were the direct

and proximate cause of the violations of Plaintiff's Fourth Amendment rights, his physical injuries, mental suffering, anguish and humiliation and expenses, as set forth above.

WHEREFORE, Plaintiff demands substantial actual or compensatory damages against Defendants Piwnicki, Carey and McDevitt and because they acted maliciously, wantonly or oppressively, punitive damages, plus the costs of this action, plus attorney's fees and such other relief as this Court deems equitable and just.

## COUNT II
### [42 U.S.C. § 1983 Claim for Malicious Prosecution][7]

46.     Plaintiff re-alleges paragraphs 1 through 42.

47.     Defendants Piwnicki, Carey and McDevitt, despite knowing that no probable cause existed to prosecute Plaintiff McClennon for aggravated battery on a peace officer and for resisting arrest, acted individually, jointly, and/or in conspiracy, to cause Plaintiff to be arrested, detained and prosecuted for those crimes, thereby violating Plaintiff's rights pursuant to the Fourth and Fourteenth Amendments of the United States Constitution to be free from unreasonable searches and seizures and to due process.

48.      On November 16, 2016, the prosecution terminated in Plaintiff's favor when he was acquitted at the conclusion of his criminal trial.

49.     As a direct and proximate cause of this violation of his constitutional rights, Plaintiff suffered the injuries set forth above, including, but not limited to, physical restraint, loss of liberty, emotional distress and legal fees.

---

[7] Plaintiff recognizes that the Seventh Circuit Court of Appeals has held that there is no cause of action in Illinois for malicious prosecution under 42 U.S.C. § 1983.  However, Plaintiff wishes to preserve this claim pending consideration of this issue by the United States Supreme Court in *Manuel v. City of Joliet*, No. 14-9496

WHEREFORE, Plaintiff demands substantial actual or compensatory damages against Defendants Piwnicki, Carey and McDevitt and because they acted maliciously, wantonly or oppressively, punitive damages, plus the costs of this action, plus attorney's fees and such other relief as this Court deems equitable and just.

**COUNT III**
**[42 U.S.C. §§ 1983, 1985, 1986**
**Racially Motivated Conspiracy to Deprive Plaintiff of His Constitutional Rights]**

50.     Plaintiff re-alleges paragraphs 1 through 42.

51.     Defendants Piwnicki, Carey and McDevitt, together reached an understanding, engaged in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to commit the unconstitutional overt acts set forth in the facts above.

52.     Because said conspiracy or conspiracies and the overt actions in furtherance thereof, including, but not limited to, each and every act alleged in the facts above, were performed with the knowledge and purpose of depriving Plaintiff, who is African American, and other African American victims of the equal protection of the laws and/or of equal privilege and immunities under the law, and with racial animus toward Plaintiff, the Defendants also deprived Plaintiff of his right to equal protection of the laws under the Fourteenth Amendment, and 42 U.S.C. § 1985.

53.     Additionally or alternatively, Carey and McDevitt, knowing that the above § 1985 conspiracy to illegally harm, charge and abuse Plaintiff was about to be committed, and having the power to prevent or aid in preventing the commission of the acts in furtherance of said conspiracy, neglected and/or refused to do so, in violation of 42 U.S.C. § 1986.

WHEREFORE, Plaintiff demands substantial actual or compensatory damages against Defendants Piwnicki, Carey and McDevitt and because they acted maliciously, wantonly or

oppressively, punitive damages, plus the costs of this action, plus attorney's fees and such other relief as this Court deems equitable and just.

## COUNT IV
### [42 U.S.C. § 1983 *Monell* Policy Claim Against Defendant City of Chicago]

54.     Plaintiff re-alleges paragraphs 1 through 53.

55.     The actions of Defendants Piwnicki, Carey and McDevitt were committed pursuant to one or more interrelated *de facto* policies, practices and/or customs of the City of Chicago, its police department, its Police Board, its Office of Professional Standards (OPS), Internal Affairs Division (IAD), Independent Police Review Authority (IPRA), its Personnel Division, and/or its Superintendents of Police.

56.     At all times material to this complaint the Defendant City and its police department, police Superintendents, OPS, IAD and IPRA, Personnel Division and/or Police Board had interrelated *de facto* policies, practices, and customs which included, *inter alia*, a) the failure to properly hire, train, supervise, discipline, transfer, monitor, counsel and otherwise control police officers who commit acts of excessive force; and/or b) the police code of silence; and/or c) encouragement of wrongful arrests, prosecutions, and imprisonments.

57.     The policy, practice, and custom of a police code of silence results in police officers refusing to report instances of police misconduct of which they are aware, despite their obligation under police regulations to do so, and also includes police officers either remaining silent or giving false and misleading information during official investigations in order to protect themselves or fellow officers from internal discipline, civil liability, or criminal charges, and to perjure themselves in criminal cases where they and their fellow officers have used excessive force.

58.     The fact that the aforementioned code of silence exists, and its existence harms

civilians through the actions and inactions of high ranking police officials, including police Superintendents, OPS Directors and IPRA Directors, is evidenced by the fact that while former Superintendent Martin, former OPS Director Fogel, former Mayor Richard M. Daley, and former OPS Director Shines have all acknowledged publicly that they are aware of the existence of the custom and practice of a police code of silence, they have not acted to eliminate the code or to counteract its impact on police discipline, the use of excessive force, fabrication of evidence and false arrests and prosecutions prior to 2016.

59.     Most recently, Mayor Rahm Emanuel admitted the existence of the code of silence and its adverse impacts before Chicago's City Council on December 9, 2015, stating: "The problem is sometimes referred to as the thin Blue Line.  Other times it is referred to as the code of silence. . . .We cannot ask citizens in crime-ravaged neighborhoods to break the code of silence if we continue to allow a code of silence to exist within our own police department."

60.     The *de facto* policies, practices and customs of failing to hire, train, supervise, monitor, discipline, counsel or control police misconduct, the code of silence and the encouragement of false arrests and prosecutions are interrelated and exacerbate the effects of each other, to, in the words of former OPS Director Fogel, "institutionalize police lying" and "immunize police officers from discipline."

61.     Additionally, the reality that the unconstitutional actions of the Defendant Officers were part of a widespread municipal policy, practice and custom is further established by the involvement in, and ratification of, these acts by municipal supervisors and policymakers, including, but not limited to, Mayor Emanuel, Mayor Richard Daley and Chicago Police Department Superintendents, and by a wide range of other police officials, officers, and divisions of the Department, including its Internal Affairs Division, the Detective Division, and the Public

Affairs Section.  This involvement and ratification is further demonstrated, *inter alia*, by the public statements of these policymaking officials, and the Department's total failure to investigate the unconstitutional conduct of the Defendant Officers or other Chicago Police Officers, or to discipline them, in this and/or other cases, for their unconstitutional conduct.

62.     As part of this widespread *de facto* policy of immunizing police officers from discipline, IPRA has continued the pattern and practice of willfully failing to adequately investigate citizen complaints of police misconduct.  The overwhelming majority of complaints result in outcomes where the officers involved face no form of discipline whatsoever.  As a result of IPRA's failure to properly investigate and recommend disciplinary action, police officers have learned that they can violate the rights of Chicago residents with impunity, knowing that the likelihood of being held accountable by the City of Chicago for their unlawful actions is extremely rare.  This *de facto* policy was acknowledged by Mayor Rahm Emanuel before Chicago's City Council on December 9, 2015, when he noted then that the Police Accountability Task Force would investigate why "police officers with repeated and multiple citizen complaints of excessive force have yet to face any meaningful disciplinary action."

63.     In April 2016, Emanuel's Task Force on Police Accountability issued its comprehensive report, which condemned the CPD as fundamentally racist and dominated by a pervasive code of silence, with a police disciplinary system that is completely broken. The Task Force found that CPD was replete with "systemic institutional failures going back decades that can no longer be ignored." *See* Police Accountability Task Force, Executive Summary, p. 5 (April 2016). The report noted, among other things, that the data analyzed "gives validity to the widely held belief that police have no regard for the sanctity of life when it comes to people of color." *Id*. at p. 8. The Task Force report specifically condemned the IPRA, finding:

21

> "IPRA is badly broken. Almost since its inception, there have been questions about whether the agency performed its work fairly, competently, with rigor and independence. The answer is no. Cases go uninvestigated, the agency lacks resources and IPRA's findings raise troubling concerns about whether it is biased in favor of police officers. Up until recently, the agency has been run by former law enforcement, who allowed leadership to reverse findings without creating any record of the changes."

*Id*. at p. 15. The Task Force further provided: "The enduring issue of CPD officers acquiring a large number of Complaint Registers remains a problem that must be addressed immediately. . . . The only conclusion that can be reached is that there is no serious embrace by CPD leadership of the need to make accountability a core value. These statistics give real credibility to the widespread perception that there is a deeply entrenched code of silence supported not just by individual officers, but by the very institution itself." *Id*. at p. 13.

64.     The aforementioned policies, practices and/or customs of failing to hire, supervise, discipline, monitor, transfer, counsel, and control police officers, the police code of silence, and the encouragement of excessive force, police misconduct, false arrests, imprisonments, prosecutions, and convictions, separately and together, proximately caused injury to Plaintiff McClennon in this case, *inter alia*, because Defendant Piwnicki and the other Defendant Officers had good reason to believe the following: their misconduct would not be revealed or reported by fellow officers or their supervisors, that their denials of misconduct would go unchallenged by these supervisors and fellow officers, police Superintendents, Police Board, and Directors of OPS, IPRA and IAD, and that they and other Chicago Police Officers were effectively immune from meaningful disciplinary action, thereby protecting them from the consequences of their unconstitutional conduct.

65.     Based on the belief and understanding that each of them would be protected from significant career consequences by fellow officers, by the department and by IPRA, Defendants Piwnicki, Carey and McDevitt felt empowered to violate the rights of Plaintiff.

22

66.     Specifically, Defendant Piwnicki has repeatedly been accused of misconduct, including *inter alia*, allegations of racist verbal abuse, excessive force, false arrest, and illegal search against civilians.  He has amassed 89 complaints of official misconduct during his employment with the Chicago Police Department and he has not been promptly and meaningfully disciplined for his egregious misconduct, only some of which is described in paragraphs 10-40 above.

67.     In addition, Defendant Carey has repeatedly been accused of misconduct, identified in sixty-seven complaint register files, many of which include allegations that he used excessive force, false arrested and or illegally searched a civilians.  He also has not been promptly and adequately disciplined for such egregious misconduct.

68.     In addition, Defendant McDevitt had repeatedly been accused of misconduct, including, *inter alia*, allegations of excessive force, false arrest, and illegal search. Upon information and belief, he was not promptly and adequately disciplined for such egregious misconduct.

69.     Said interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented by Defendant City of Chicago with deliberate indifference, and encouraged the Defendant Officers to commit the aforesaid acts against Plaintiff McClennon, and therefore acted as the moving force and were, separately and together, direct and proximate causes of said constitutional violations, and injuries to Plaintiff McClennon.

70.     Additionally, Defendant City of Chicago's failure to properly hire, train, supervise, discipline, monitor, control, counsel, and transfer Defendants Piwnicki, Carey and McDevitt, was also done with deliberate indifference and likewise acted as a direct and

proximate cause of the injuries to Plaintiff McClennon.

71.     The Defendant City of Chicago' policies, practices and customs encouraged, *inter alia*, police misconduct, including, but not limited to, excessive force, the making of false statements and reports, the use of racist verbal abuse, the filing of false charges and allegations, were, separately and together, the moving force and a direct and proximate cause of the unconstitutional acts committed by Defendants Piwnicki, McDevitt and Carey in this case and the injuries sustained by Plaintiff McClennon.

WHEREFORE, Plaintiff demands judgment against Defendant City of Chicago for substantial compensatory damages, plus costs and attorneys' fees and whatever additional relief this Court finds equitable and just.

### COUNT V
### [State Law Claim for Malicious Prosecution]

72.     Plaintiff re-alleges paragraphs 1 through 42.

73.     Defendants Piwnicki, Carey and McDevitt individually, jointly, and in conspiracy, initiated and continued a malicious prosecution without probable cause against Plaintiff McClennon.

74.     The prosecution of Plaintiff McClennon terminated in his favor.

75.     The Defendant Officers' actions were performed in a willful and wanton manner.

76.     The Defendants Officers' actions directly and proximately caused the injury and damage to Plaintiff set forth above.

WHEREFORE, Plaintiff McClennon demands actual or compensatory damages against Defendants Piwnicki, Carey and McDevitt and because these Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, punitive damages, and such other and additional relief as this Court deems equitable and just.

## COUNT VI
### [State Law Claim for Intentional Infliction of Emotional Distress]

77.   Plaintiff re-alleges paragraphs 1 through 53, and 72 through 76.

78.   Defendants Piwnicki, Carey and McDevitt individually, jointly, and in conspiracy, engaged in extreme and outrageous conduct by physically abusing and tasing Plaintiff McClennon, and/or by failing to prevent or stop the abuse of Plaintiff, by constructing a false version of events to cover up their conduct and maliciously prosecuting Plaintiff for a felony he did not commit.

79.   Defendants Piwnicki, Carey and McDevitt intended to inflict severe emotional distress on Plaintiff, and knew that their conduct would cause Plaintiff severe emotional distress.

80.   As a direct and proximate result of Defendant Officers' outrageous conduct, Plaintiff McClennon was injured and has experienced, and continues to experience, severe emotional distress, including fear of the police, nightmares, sleep disruption, and anxiety. WHEREFORE, Plaintiff McClennon demands judgment against Piwnicki, Carey and McDevitt for compensatory damages, plus the costs of this action, and such other relief as this Court deems equitable and just.

## COUNT VII
### [State Law Claim for Conspiracy]

81.   Plaintiff re-alleges paragraphs 1 through 63 and 72 through 80.

82.   Defendants Piwnicki, Carey and McDevitt with other unsued co-conspirators, including police personnel, together reached an understanding, engaged and continue to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between

themselves to falsely arrest, maliciously prosecute Plaintiff and/or to intentionally inflict severe emotional distress on Plaintiff.

83. In furtherance of this conspiracy or conspiracies, the Defendants named above, together with their unsued co-conspirators, committed the overt acts set forth above.

84. The conspiracy or conspiracies were and are continuing in nature.

WHEREFORE, Plaintiff McClennon demands compensatory damages, jointly and severally from Defendants Piwnicki, Carey and McDevitt, and, because these Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, for punitive damages, plus the costs of this action and whatever additional relief this Court deems equitable and just.

## COUNT VIII
### [State Law *Respondeat Superior* Claim]

85. Plaintiff re-alleges paragraphs 1 through 42 and 72 through 84.

86. Defendants Piwnicki, Carey and McDevitt, were, at all times material to this Complaint, employees of the Defendant City of Chicago; were acting within the scope of their employment; and their acts, which violated state law, are directly chargeable to the Defendant City under state law pursuant to *respondeat superior*.

WHEREFORE, Plaintiff McClennon demands judgment against the City of Chicago for any and all compensatory damages awarded on Plaintiff's state law claims, plus the costs of this action and whatever additional relief this Court deems equitable and just.

## COUNT IX
### [745 ILCS 10/9-102 Claim Against Defendant City of Chicago]

87. Plaintiff re-alleges paragraphs 1 through 86.

88. Defendant City of Chicago was the employer of Defendants Piwnicki, Carey and McDevitt at all times relevant to this complaint.

26

89.    Defendants Piwnicki, Carey and McDevitt committed the acts alleged above under color of law and in the scope of his employment as an employee of the City of Chicago.

WHEREFORE, Plaintiff, pursuant to 745 ILCS 10/9-102, demands judgment against the Defendant City of Chicago in the amount awarded to Plaintiff McClennon against the Defendants as damages, attorneys' fees, costs and interest, and/or for any settlement entered into between the Plaintiff and any Defendant and for whatever additional relief this Court deems equitable and just.

Respectfully submitted,

Dated: December 21, 2016

/s/ Joey L. Mogul
JOEY L. MOGUL
People's Law Office
1180 N. Milwaukee Ave.
Chicago, IL 60642
773/235-0070

CHERYL BORMANN
Law Office of Cheryl T. Bormann
327 S Plymouth Court
Suite 201
Chicago, IL 60604
312/588-5011

Attorneys for Plaintiff McClennon

**Plaintiff Demands Trial by Jury**